**UNITED STATES DISTRICT COURT**
<u>SOUTHERN DISTRICT OF NEW YORK</u>

**MEDICAL IMAGING CORP. ,**                                      **Docket No. 17 cv 8495**

                     **Plaintiff.**                                      **NOTICE OF**
                                                       **MOTION**

     **vs.**

**PARTNERS IMAGING HOLDINGS, LLC,**

                     **Defendant.**

_____/

PLEASE TAKE NOTICE, that based upon the declaration of James H. Burgess, Jr., sworn to the day of November, 2017, the exhibits attached hereto, the memorandum of law and upon all of the pleadings and proceedings had heretofore herein, the defendant, PARTNERS IMAGING HOLDINGS, LLC, will move this Court before the Honorable Sidney Stein, Judge, United States District Court for the Southern District of New York, located at the Courthouse, 500 Pearl Street, New York, New York, for an Order;

       a. Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure and Local Rule 7.1, for an Order dismissing the complaint; or in the alternative

       b. An Order staying the instant action pending the resolution of the case filed in the United States District Court for the Middle District of Florida, Tampa Division entitled <u>Medical Imaging Corp., et. al v Partners Imaging Holdings, LLC,</u> Docket No. 17 cv 1933; and

       c. For such other and further relief as to the Court deems just and proper

Respectfully submitted,

James H. Burgess, Jr., Esq.
Florida Bar No. 0280763
Attorney for Defendant Partners Imaging
Holdings, LLC
1776 Ringling Boulevard
Sarasota, FL 34236
Telephone: 941-366-3700
Facsimile:  941-366-0189
Email: jburgess@burgessharrell.com


BY:    s/James H. Burgess, Jr.
          James H. Burgess, Jr.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**　　　　　　　　

| | |
|---|---|
| **MEDICAL IMAGING CORP.**, | **Docket No. 17 cv 8495** |
| **Plaintiff,** | |
| | **DECLARATION** |
| **vs.** | |
| **PARTNERS IMAGING HOLDINGS, LLC,** | |
| **Defendant.** | |

_____

JAMES H. BURGESS, JR., hereby declares under penalties of perjury:

1.　　　I am the attorney for the defendant Partners Imaging Holdings, LLC.

2.　　　I submit this declaration in support of the defendant's motion which seeks an Order pursuant to FRCP 12(b) and Local Rule 7.1 dismissing the complaint due to the pendency of an action between the same parties now pending in the United States District Court for the Middle District of Florida, Tampa Division entitled Medical Imaging Corp., et. al v Partners Imaging Holdings, LLC, Docket No. 17 cv 1933 filed on August 15, 2017 (hereinafter "Florida Suit") a copy of the Florida Suit is attached hereto as Exhibit "1"(It is requested that the Court take judicial notice of Exhibit "1")

3.　　　The complaint herein was originally filed in the New York State Supreme Court, New York County on September 26, 2017 under Index No. 65046/17 (hereinafter "NY Suit") the NY Suit was served on October 5, 2017.

4.　　　The NY Suit was removed to this Court by the filing of a Notice of Removal (amended) on November 2, 2017.

5.     The motion seeks, in the alternative, an Order staying the instant action as Plaintiff is not entitled to have two actions pending on the same subject matter.

6.     Defendant's motion must be granted.

7.     Plaintiff has sued Defendant herein for breach of contract in the two above different Courts alleging two separate breaches and alleging the release it gave Defendant for the claims found in Plaintiff's Complaint in the instant action is unenforceable as an unconscionable contract of adhesion.

8.     The Florida Suit seeks an accounting (Count I) and asserts an alleged breach of contract consisting of several documents referred to as the Billing Agreement between the parties (Count II).

11.     In the Florida Suit, Medical Imaging Corp., alleges it purchased the other Plaintiffs assets from Defendant pursuant to a Purchase Agreement (the Agreement sued upon in the NY Suit) dated August 28, 2014 (par. 5 of the Florida Suit) and then entered into a Professional Services Agreement for Defendant to provide billing services to Plaintiffs (par. 9 and Exhibit 1 to the Florida Suit).

12.     The Florida Suit was filed by Plaintiff before the New York Suit.

13.     It is submitted that Plaintiff has split its claims against Defendant requiring dismissal of this suit or the staying of this suit as the Complaint filed in the NY Suit arises out of the same facts and circumstances as the one in the Florida Suit.

14.     The rule against splitting claims requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit.

15.     If the Court rules the Plaintiff did not split its causes of action requiring dismissal, then Count I of the NY Suit should be dismissed for failure to state a cause of action.

16.     If Count I is dismissed, then Count II must be dismissed as the amount in controversy does meet the jurisdictional requirement of this Court.

WHEREFORE, Defendant prays this Court will dismiss the Complaint of Plaintiff or in the alternative, stay the instant action pending the determination of the action <u>Medical Imaging Corp., et. al v Partners Imaging Holdings, LLC,</u> United States District Court Middle District of Florida, Tampa Division, Docket No. 17 cv  1933.

<u>s/James H. Burgess, Jr.</u>
James H. Burgess, Jr.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**MEDICAL IMAGING CORP. ,**                                    **Docket No. 17 cv 8495**

                       **Plaintiff,**

         **vs.**

**PARTNERS IMAGING HOLDINGS, LLC,**

                       **Defendant.**

_____

**DEFENDANT'S**
**MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION**

# I.     Dismissal Standard

The determination of whether the complaint states a cause of action is a question of law for the court. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997). Although Courts construe pleadings liberally pursuant to FRCP 15(a)(2), "bald assertions and conclusions of law will not suffice." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). The pleadings must create the possibility of a right to relief that is more than "speculative". *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87(2d Cir.2007).

To survive a motion to dismiss pursuant to FRCP 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face" *Bell Atl. Corp. v Twombly,* 550 U.S. 544 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556. The plausibility standard is not akin to a "probability requirement" but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with a defendant's liability, it will stop short of the line between possibility and plausibility of entitlement to relief. Id. at 557.

In addition, a Court does not have to accept as true all of the allegations contained in the complaint as true, since it is inapplicable to legal conclusions. Threadbare recitals of the element of a cause of action or legal conclusions couched as factual allegations, supported by mere conclusory statements do not suffice and are not accepted as true. Id at 555. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level."  Legal conclusions,

deductions or opinions couched as factual allegations are not given a presumption of truthfulness. *Mason v American Tobacco Co*., 346 F3d 36 (2d Cir. 2003) cert. denied 541 U.S. 1057 (2004).

For purposes of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). However, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Legal conclusions, as opposed to well plead factual allegations, "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As a result, "(a) pleading that offers 'labels and conclusions' or a "formulaic recitation of the elements of a cause of action will not do.'" *Id*. At 678. "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'"*Id*.

Courts apply a two-pronged approach when considering a motion to dismiss. *Am. Dental Ass'n v Cigna Corp*., 605 F.3d 1283, 1290 (11th Cir. 2010). First, a court must "eliminate any allegations in (a) complaint that are merely legal conclusions." *Id*. A court should then taken the remaining well plead factual allegations, assume them to be true, and then determine whether they plausibly give rise to an entitlement to relief. *Id*.  A complaint that does not "contain sufficient factual matter, accepted as true, to state a claim. . . plausible on its face" is subject to dismissal. *Id*. at 1289. Further, dismissal is warranted under Rule 12 (b) (6) if, assuming the truth of Plaintiff's factual allegations, a dispositive legal issue precludes relief. *Neitzke v Williams*, 490 U.S. 319, 326 (1989).

## II.      Facts and Argument

### A. Claim-Splitting

"The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit." *Katz v Gerardi*, 655 F.3d 1212, 1216 (10th Cir. 2011).  See, *Colorado River Water Conservation Dist. V. United States*, 424 U.S. 800 (1976) (As between federal district courts the general principle is to avoid duplicative litigation). "By spreading claims around in multiple lawsuits in other courts or before other judges, parties waste "scarce judicial resources" and undermine "the efficient and comprehensive disposition of cases." *Hartsel Springs Ranch of Colo., Inc. v Bluegreen Corp*., 296 F. 3d 982, 985 (10th Cir. 2002)." *Id.* at 1215.  As stated in *Curtis v Citibank*, 226 F. 3d 133, 138-139 (2d Cir. 2000):

As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit. (citations omitted). The complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion. (citations omitted). . .

The rule against duplicative litigation is distinct from but related to the doctrine of claim preclusion or res judicata. As the Supreme Court stated over 100 years ago in *United States v. the Haytian Republic*, 154 U.S. 118 (1894), '[T]he true test of the sufficiency of a plea of 'other suit pending' in another forum [i]s the legal efficacy of the first suit, when finally disposed of, as 'the thing adjudged,' regarding the matters at issue in the second suit." *Id*. at 124. The two doctrines serve some of the same policies. The power to dismiss a duplicative lawsuit is meant to foster judicial economy and the "comprehensive disposition of litigation." *Kerotest Mfg*., 342 U.S. at 183. The doctrine is also meant to protect parties from "the vexation of concurrent litigation over the same subject matter." *Adam*, 950 F. 2d at 93.

Similarly, while the doctrine of claim preclusion serves the interest of society and litigants in assuring the finality of judgments, it also fosters judicial economy and protects the parties from vexatious and expensive litigation. (citations omitted). Because of the obvious difficulties of anticipating the claim or issue-preclusion effects of a case that is still pending, a court faced with a duplicative suit will commonly stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or consolidate the two actions. (citations omitted). Of course, simple dismissal of the second suit is another common disposition because plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time."

The Florida Suit was filed on August 15, 2017, and the claims found in it arise from the transaction sued upon in the New York Suit. The Florida Suit specifically alleges the transaction involving the Asset Purchase Agreement (APA) which is alleged to be breached in the New York Suit (Florida Suit par.5, 6, 7; New York Suit par. 5, 6, 7). The Florida Suit even alleges there was a breach of the APA for Defendant's failure to disclose it did not have an ACHA license, just like the New York Suit (Florida Suit par. 6 and 7; New York Suit par. 5, 6, 7, 21, 22, 23). The Florida Suit does not sue for breach of the APA even though it alleges Defendant breached the APA. Rather, the Florida Suit alleges a breach of the Professional Services Agreement signed at the closing on the APA and the subsequent amendments that include the release language in the Global Amendment Agreement (Exhibit 2 to the Florida Suit).  The New York Suit recites the facts surrounding the entry by the parties into the APA, the Professional Services Agreement, the Global Amendment Agreement and release language therein, and then sues only for a breach of the APA while claiming the release is unconscionable (New York Suit par. 5-16, 20-22). The allegations are almost identical to those in the Florida Suit (Florida Suit par. 13-31). This is clear claim-splitting as Plaintiff could have sought relief for a breach of the APA in the Florida Suit and it even alleged a breach of the APA in the Florida Suit.  Instead it chose not to seek relief for breach of the APA and to bring a separate suit in New York seeking relief for the breach of the APA.

Interestingly, the Florida suit does not allege the release involved was unconscionable but rather attempts to plead around the release language in the Global Amendment Agreement and its amendments (Florida Suit, par. 23-26 and page 5, footnote 1). In the New York Suit Plaintiff specifically alleges the release found in the Global Services Agreement is unconscionable (New York Suit par. 6-14).  In fact Jeffrey Chubak, counsel for Plaintiff in the Second Suit is also

counsel for Plaintiff in the First Suit. It is clear the claims in both suits arise out of the same transaction and set of facts and involve interpretations of the same agreements. As a result, Plaintiff has split its claims against the Defendant and the New York Suit should be dismissed or stayed or there will be issues of claim preclusion or res judicata depending on which case is ruled upon first. It is submitted that a dismissal or stay of the New York Suit with the Florida Suit fosters judicial economy and protects the parties from vexatious and expensive litigation. Furthermore, Plaintiff has no right to maintain two actions on the same subject matter.

It should be pointed out that the Billing Agreement, Global Amendment Agreement, and the subsequent modifications found in the Florida Suit do not contain a venue provision. The APA sued upon in the New York Suit contains a venue provision for New York. Plaintiff chose to file the Florida Suit first and needed to bring all its claims in that suit. *Curtis v Citibank*, *supra*.

## B. Failure to State a Claim

If the Court denies the Motion to Dismiss or Stay on the basis of claim-splitting, then Count I of the Complaint should be dismissed for failure to state a claim upon which relief can be granted. To state a breach of contract cause of action the Plaintiff must allege a contract, the Plaintiff's performance of the contract, Defendant's breach of the contract and damages. *J.P. Morgan Chase v J.H. Electric of New York, Inc.*, 69 A.D. 802 (2d Dept. 2010). In Count I of Plaintiff's Complaint (par. 21-22) Plaintiff asserts a breach of Section 3.9 (c) of the APA by a failure to disclose all permits needed for Plaintiff to conduct the business. Plaintiff claims Defendant did not disclose it had an exemption from the need for an Agency for Healthcare Administration (AHCA) license. (See par. 7 and footnote 1 on page 2 of the Complaint).

Paragraph 3.9 (c) specifically refers to Schedule 3.9 (c) of the Disclosure Schedule. Schedule 3.9 (c) lists all licenses Defendant needed to operate its business. An ACHA license is not on the list of licenses. As alleged by Plaintiff in footnote 1, Defendant did not need an ACHA license to operate its business. Defendant disclosed it did not have an ACHA license on Schedule 3.9 (c). As a result, there can be no breach of contract as Defendant did disclose it did not have an ACHA license. Defendant cannot be expected to know what licenses Plaintiff had or whether Plaintiff had an ACHA license. Defendant listed the licenses it needed to operate its business and an ACHA license was not listed on Schedule 3.9 (c). If Plaintiff needed an ACHA license to operate the business of Defendant, it should have known that and either not closed the transaction or sought additional time to close so that it could get its ACHA license before buying the business.

If there was no breach of the APA as alleged by Plaintiff, then the issue surrounding whether the release was unconscionable is moot.

### III.   Dismissal

If the case is not dismissed for claim-splitting but Count I is dismissed for failure to state a cause of action, then Count II should be dismissed for the failure to meet this Court's jurisdictional limit. Paragraph 27 of Count II alleges damages of $50,331 in unpaid taxes. Section 28 U.S.C. 1332 requires the amount in controversy to exceed $75,000.00, exclusive of interests and costs, for diversity jurisdiction. Count II does not meet the required amount in controversy.

**IV.    Conclusion**

For the reasons set forth above the Defendant respectfully requests the Court dismiss the

Complaint of Plaintiff or Stay the proceeding in this Court and require all claims be brought by

Plaintiff in the Florida Suit.

Respectfully submitted,

James H. Burgess, Jr., Esq.
Florida Bar No. 0280763
Attorney for Defendant Partners Imaging
Holdings, LLC
1776 Ringling Boulevard
Sarasota, FL 34236
Telephone: 941-366-3700
Facsimile:  941-366-0189
Email: jburgess@burgessharrell.com


BY:___s/James H. Burgess, Jr._____
          James H. Burgess, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of November 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:


Jeffrey Chubak, Esquire

STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, NY 10017 10017
Telephone: (212) 497-8247
Facsimile: (212) 490-4208
Email:jchubak@storchamini.com

Lance Grossman
11 Broadway-Suite 615
New York, NY 10004
Telephone: (212) 571-4649
Email: lsglawoffices@verizon.net


By:    s/James H. Burgess, Jr.
       James H. Burgess, Jr.
       Florida Bar No. 0280763

RECEIVED

AO 440 (Rev 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

2017 AUG 15  PM 12: 56

for the

Middle District of Florida

CLERK. US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

| | |
|---|---|
| MEDICAL IMAGING CORP., PARTNERS IMAGING CENTER OF VENICE, LLC, PARTNERS IMAGING CENTER OF CHARLOTTE, LLC, and PARTNERS IMAGING CENTER OF NAPLES, LLC, | ) ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. 8:17-Cv-1933 - T- 36 TGW |
| PARTNERS IMAGING HOLDINGS LLC | ) ) |
| | ) ) |
| *Defendant(s)* | ) |

**A TRUE COPY**
Date: 8-22-17   Time: 1:45 P
MLZ/ 031 – 12th Circuit ☐
STZ/ 283 – 12th Circuit ☒
SZ/ 613 – 12th Circuit ☐
CTM/ 723 – 12th Circuit ☐

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   DAYANI YOUNG, REGISTERED AGENT
PARTNERS IMAGING HOLDINGS LLC
1250 S. Tamiami Trail, Suite 101
Sarasota, FL 34239

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:   **AUG 1 5 2017**

*Signature of Clerk or Deputy Clerk*

Exhibit 1

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

No. 8:17-cv-1933-T-36 TGW

MEDICAL IMAGING CORP., PARTNERS
IMAGING CENTER OF VENICE, LLC,
PARTNERS IMAGING CENTER OF
CHARLOTTE, LLC, and PARTNERS
IMAGING CENTER OF NAPLES, LLC,
                Plaintiffs,       **COMPLAINT**

- against -

PARTNERS IMAGING HOLDINGS LLC,
                Defendant.    /

      Plaintiffs Medical Imaging Corp. ("Medical Imaging"), Partners Imaging Center of

Venice, LLC ("Venice"), Partners Imaging Center of Naples, LLC ("Naples"), and Partners

Imaging Center of Charlotte, LLC ("Charlotte") (collectively, the "Plaintiffs"), by and through

their undersigned counsel, allege the following for their Complaint against Defendant Partners

Imaging Holdings LLC ("Defendant"):

## PARTIES

      1.    Plaintiff Medical Imaging is a healthcare company focused on medical diagnostic

imaging that is incorporated and headquartered in Nevada. It is the sole member of each of

Plaintiffs Venice, Naples, and Charlotte.

      2.    Defendant Partners Imaging Holdings LLC is a Florida LLC. Its members,

Richard M. Goldberg, M.D. and Roman Rozin, M.D., are Florida citizens.

## JURISDICTION AND VENUE

      3.    This Court has jurisdiction over this action under 28 U.S.C. § 1332 because there

is complete diversity of citizenship between Plaintiffs, on the one hand, and Defendant, on the

other, and the amount in controversy exceeds $75,000.

TPA045275

Exhibit 1

4.      Venue is proper in this Court under 28 U.S.C. § 1391.

## NATURE OF ACTION

5.      Defendant sold its ownership interests in Naples, Venice, and Charlotte (each individually a "Company" and collectively the "Companies") to Medical Imaging, pursuant to a Purchase Agreement, dated August 28, 2014 (the "Purchase Agreement").

6.      Defendant breached its representation and warranty in the Purchase Agreement that Medical Imaging was receiving all permits it needed to operate the business of the Companies.

7.      In particular, each Company lacked the Agency for Healthcare Administration ("AHCA") license needed to operate its facility.

8.      Without AHCA licensure, the Companies could not independently maintain billing arrangements with government payors (*i.e.*, Medicare or Medicaid) or private third-party payors (*i.e.*, private insurance) (together, "Payors"), forcing them to rely on Defendant to provide billing-related services to the Companies starting on November 1, 2014.

9.      Defendant agreed to provide said billing-related services starting on November 1, 2014 pursuant to a Billing Agreement (defined below) in exchange for a percentage of amounts collected on the Companies' behalf, and further agreed to "work AR on a continuous basis," "diligently pursue processing for payment from ... Payors ... and ... use best efforts to submit claims within ... five business days," and "notify [Medical Imaging] as soon as practicable about any problems ... encountered ... in processing the reimbursement claim."

10.     After the Companies obtained AHCA licenses on or about October 1, 2015 and made independent billing arrangements with Payors, Defendant advised Plaintiffs that $447,581 in patient billings had been "disallowed," while $710,742 had been "written off" prior to termination of the billing arrangement in August 2016.   By contrast, Defendant's total

2

Exhibit 1

collections on the Companies' behalf during the entire term of their billing arrangement (November 2014-August 2016) was only $2.70 million.  Plaintiffs have asked Defendant for information concerning these disallowed and written off amounts, but Defendant has refused to provide any backup or otherwise respond to Plaintiffs' requests.

11.     By this action, among other things, Plaintiffs seek a judgment directing an accounting with respect to amounts disallowed or written off during the term of the Billing Agreement and awarding damages for breach of the same.

## BACKGROUND

### I.     THE PURCHASE AND BILLING AGREEMENTS

12.     Medical Imaging purchased the Companies for $1.8 million pursuant to the Purchase Agreement, subject to certain adjustments.

13.     To ensure the uninterrupted continuation of services from and after November 1, 2014, Medical Imaging and Defendant entered into a Professional Services Agreement, dated October 31 but effective as of November 1, 2014 (the "Billing Agreement," attached as Exhibit 1), pursuant to which Defendant agreed to provide billing-related services to the Companies for a fixed period.

14.     Pursuant to Section 1 of the Billing Agreement, Medical Imaging engaged Defendant as its exclusive provider of billing services.

15.     Pursuant to Section 3, Medical Imaging agreed to provide Defendant with "billing packets" in a format set by Defendant.

16.     Pursuant to Section 2, Defendant agreed to accept the billing packets, upload information therein to Defendant's radiology information system, and use that information to submit claims to and invoice Payors on behalf of the Companies.  In addition, Defendant agreed to collect the resulting revenues on the Companies' behalf and pay Medical Imaging the same on

3

Exhibit 1

a weekly basis less fees deducted under Section 5. Defendant further agreed to "take all steps to collect monies due from payors in the shortest possible time frame and ... work AR on a continuous basis." Defendant also agreed to "provide [a] summary of any AR not collected at the end of the agreement."

17. Pursuant to Section 5, Medical Imaging agreed to pay Defendant 5% of revenues collected on behalf of the Companies for billing and collection services, which fee would be deducted from amounts paid under Section 2.

18. Section 6 provided the agreement would be for a fixed term. The parties contemplated Plaintiffs making independent billing arrangements with Payors prior to the Billing Agreement's termination.

19. During the agreement's term billing packets were submitted to Defendant in the form and manner requested by it.

## II.   BILLING AGREEMENT AMENDMENTS DUE TO THE AHCA LICENSING PROCESS

20. After November 1, 2014, Medical Imaging advised Defendant that it believed it breached its obligation under Section 3.9(c) of the Purchase Agreement to disclose all permits needed to conduct the business, as the corresponding schedule disclosing said permits omitted AHCA licenses for the Companies required pursuant to Fla. Stat. § 400.991(1)(a).

21. The absence of AHCA licenses for the Companies precluded Medical Imaging from lining up independent billing arrangements for the Companies after November 1, 2014 as originally contemplated, as the Companies could not enter into billing arrangements with Payors so long as they lacked such licenses.

22. Upon discovery of the omission, Plaintiffs promptly commenced the AHCA license application process.

4

Exhibit 1

23.     Plaintiffs, however, had no choice but to remain entirely dependent on Defendant to provide billing and collection services because of the lead time required to apply for and obtain AHCA licenses on behalf of the Companies and, on receipt of the same, enter into billing arrangements with Payors.

24.     Defendant conditioned the continuation of the Billing Agreement's term on Plaintiffs' signing a Global Amendment Agreement, dated March 11, 2015 (the "Amendment," attached as Exhibit 2).

25.     Section 17 of the Amendment included a release by Plaintiffs of "(i) any claim, under the [Purchase Agreement] that [Defendant] did not disclose one or more license requirements or an exemption from any license requirement for any Company," effective as of a later date (as described below), and "(ii) a claim, under the [Billing Agreement] that the services due prior to the date hereof were not timely under the terms of the agreement."[1]

26.     Pursuant to Section 8, Defendant further agreed to "diligently pursue processing for payment from the Government ... and Private Payors ... and ... use best efforts to submit claims within ... five business days," and "notify the Company contact person [i.e., Medical Imaging] as soon as practicable about any problems ... encountered ... in processing the reimbursement claims."

27.     The Companies had not yet been awarded AHCA licenses as expiration of the Billing Agreement's term under the Amendment neared, and so entered into a Modification

---

[1] Significantly, the release under Section 17(ii) did not release Defendant from the claims herein, which are not for failure to *timely* bill or collect, but for failure to bill certain services *at all* or make any follow-up effort to collect on claims rejected in whole or in part by a Payor *at all*. Had Defendant merely billed and collected late, there would be no need to bring this action.

Exhibit 1

Agreement, dated June 1, 2015 ("Modification Agreement," attached as Exhibit 3). Section 1.A of the Modification Agreement further extended the Billing Agreement's term.

28.     Pursuant to Section 1.D-E, the release in Section 17(i) of the Amendment would become effective, with respect to each Company, on the earlier of its receipt of an AHCA license or July 31, 2015. Pursuant to Section 1.F, the release in Section 17(ii) "releases all claims to date of this Modification Agreement."

29.     The Companies had not yet been awarded AHCA licenses as the expiration of the Billing Agreement's term under the Modification Agreement neared, and therefore entered into a Further Modification Agreement, dated on or about August 13, 2015 ("August Modification Agreement," attached as Exhibit 4). Section 1.A of the August Modification Agreement further extended the Billing Agreement's term.

30.     Pursuant to Section 1.D-E, the release in Section 17(i) of the Amendment would become effective, with respect to each Company, on the earlier of its receipt of an AHCA license or July 31, 2015. Pursuant to Section 1.F, the release in Section 17(ii) "releases all claims to date of this Modification Agreement."   It further provides that "[t]o the extent the Company or a Center gives notice that it exercises the extension set forth in paragraph A, then the release in subpart (ii) releases all claims to the later of August 31, 2015 or the date of the notice."

31.     The dates for the conclusion of the Billing Agreement were further extended beyond the August 31, 2015 date.

32.     The Companies were awarded AHCA licenses, effective on or about October 1, 2015. Although the Companies were able to start billing certain Payors soon thereafter, they remained dependent on Defendant to bill other Payors because of the lead time required to finalize billing arrangements with them. Accordingly, the parties' billing arrangement continued

6

Exhibit 1

with respect to certain Payors for several additional months, with the parties' arrangement fully

terminating in August 2016.

## III.   BREACH OF BILLING AGREEMENT

33.    At Plaintiffs' request, and in accordance with Section 2 of the Billing Agreement,

following the conclusion of the Billing Agreement's term in August 2016, Defendant sent

Plaintiffs a spreadsheet summary of patient billings not collected by Defendant on behalf of the

Companies.

34.    The spreadsheet indicated $447,581 in patient billings had been "disallowed,"

while $710,742 had been "written off."

35.    Defendant advised Plaintiffs that the former term refers to situations where a

Payor would not pay for services identified in billing packets submitted by Plaintiffs, while the

later refers to situations where Defendant voluntarily wrote down bills submitted by Plaintiffs.

36.    Defendant had not previously advised Plaintiffs that Defendant had disallowed

$447,581 in patient billings and written off $710,742 in patient billings during the Billing

Agreement's term.

37.    On November 4, 2016, Plaintiffs e-mailed Defendant as follows, through counsel:

> Nigel [Defendant's COO] sent Mitch [Medical Imaging's CEO] a
> spreadsheet which included information regarding patients seen
> during the period of the ... billing agreements and billed amounts
> which were "disallowed" or "written off." In connection with my
> client's efforts to collect remaining amounts due, it is attempting to
> understand this chart and the reason that the insurance company
> did not pay the full amount of the claim, so that we can correct the
> situation and hopefully get paid. Attached is a group of patients
> from that spreadsheet regarding patient payments and benefits. My
> client added columns A, B & C so that your client will know which
> center the patient account is under, and the amount that was
> disallowed or written off that we are inquiring about.
>
> Please have your client review their files and send us within the
> next week any backup documentation that it has regarding these

7

Exhibit 1

unpaid amounts which apparently resulted in either a write off or a disallowance. My client also does not understand why some were a write off and others were disallowed. If they can explain that as well it would be helpful.

38.     To date, Defendant has not given a response to the November 4, 2016 e-mail. Plaintiffs also made follow-up inquiries that have gone unanswered.

39.     Significantly, the total amount Defendant disallowed or wrote off ($1.16 million) is nearly one-third of the Companies' total amount actually billed for the period November 2014-August 2016, as their total collections for that period was $2.70 million.

40.     Moreover, Plaintiffs performed a random audit of many of the disallowed or written off claims by contacting Payors to whom claims were submitted, but have received no substantive explanation for the denial of payment, leaving Plaintiffs totally dependent on Defendant for an explanation.

41.     All conditions precedent to this suit have been performed, satisfied, or waived.

42.     Plaintiffs have been required to hire legal counsel and have agreed to pay them costs and attorney's fees for their services rendered in this matter.

## COUNT 1
### Accounting

43.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 42 of the Complaint as if separately set forth herein.

44.     Because of Defendant's failure to convey the Companies with AHCA licenses, Plaintiffs were 100% reliant on Defendant to handle the Companies' billing and collections after November 1, 2014, during the term of their billing arrangement, and so placed their trust and confidence in Defendant to ensure the Companies were appropriately compensated by Payors for services rendered. Plaintiffs are also entirely reliant on Defendant to understand the reason for denial of payment, by virtue of the fact that Defendant submitted claims to Payors.

8

Exhibit 1

45.     Defendant breached duties imposed on it as a result of said relationship when it advised Plaintiffs following the conclusion of their billing arrangement that $447,581 in Company billings that had been submitted to Defendant in the form and manner requested by it had been disallowed, and $710,742 had been voluntarily written off by Defendant without Plaintiffs' prior authorization.

46.     Plaintiffs have demanded an accounting, but its demand has been ignored.

47.     Plaintiffs are entitled to an accounting with respect to all moneys not paid to them as a result of said disallowances or write offs.

WHEREFORE, Plaintiffs demand judgment awarding a full accounting with respect to all moneys not paid to Plaintiffs as a result of amounts disallowed by Payors or written off by Defendant, together with such other and further relief as to this Court appears just and proper.

## COUNT 2
### Breach of Contract

48.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 42 of the Complaint as if separately set forth herein.

**Written Off Patient Billings**

49.     Pursuant to Sections 2-3 of the Billing Agreement, Medical Imaging agreed to provide Defendant with billing packets in a format set by Defendant, and Defendant agreed to upload the information therein to its radiology information system and use that information to submit claims to and invoice Payors on behalf of the Companies.

50.     Defendant further agreed under Section 8 of the Amendment to provide that it would diligently seek to generate revenues for billed services from Payors on behalf of the Companies.

9

Exhibit 1

51.     Defendant breached the foregoing obligations by writing off $710,742 in patient billings included in Plaintiffs' billing packets—more than 26% of the total amount Defendant actually collected on Plaintiffs' behalf during the term of their billing arrangement—without notifying Plaintiffs of said write offs, or even advising Medical Imaging of billing defects prior to writing off the same.

52.     As a result of Defendant's breach, Plaintiffs are entitled to damages in the amount of $710,742.

**Disallowed Claims**

53.     Defendant agreed under Section 2 of the Billing Agreement to "take all steps to collect monies due from payors in the shortest possible time frame and ... work AR on a continuous basis."

54.     Defendant further agreed under Section 8 of the Amendment to provide that it would generate revenues for billed services from Payors on behalf of the Companies, and notify Medical Imaging of any Payor claim processing or other collection problems.

55.     Defendant breached the foregoing obligations by failing to notify Medical Imaging that Payors rejected claims totaling $447,581 which had been included in billing packets previously submitted to Defendant, and then, following said rejection, failing to take any steps to remedy any defect with respect to the disallowed claim identified by the relevant Payor, or even advise Medical Imaging of said defect.

56.     Although evidence concerning the propriety or impropriety of any particular disallowance by a Payor is in Defendant's sole control, the amount at issue is such a large percentage Defendant's total collections on patient billings on behalf of the Companies during the term of their billing arrangement that it indicates that Defendant failed to appropriately pursue the claims.

10

Exhibit 1

57.     Plaintiffs are entitled to damages to the extent that the evidence (or accounting) establishes Defendant failed to address any remediable defect with respect to a claim previously submitted to a Payor, or failed to notify Medical Imaging of any defect with respect to a claim that Plaintiffs could have remedied.

WHEREFORE, Plaintiffs demand judgment in an amount to be proven at trial, but not less than $1,158,323, together with such other and further relief as to this Court appears just and proper.

Dated: August 14, 2017

/s/ Seth P. Robert

_____

Seth P. Robert
Florida Bar No. 145696
Trial Counsel
BROWN ROBERT, LLP
150 North Federal Highway
Fort Lauderdale, Florida 33301
Telephone: (954) 832-9400
Facsimile: (954) 832-9430
E-mail: srobert@brownrobert.com

- and -

Jeffrey Chubak (to be admitted *pro hac vice*)
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
Telephone: (212) 497-8247
Facsimile: (212) 490-4208
E-mail: jchubak@storchamini.com

*Attorneys for Plaintiffs*

Exhibit 1

**EXHIBIT 1**

Exhibit 1

## Professional Services Agreement

This Professional Services Agreement (this "Agreement") is entered into on October 31, 2014 effective November 1, 2014 (the "Effective Date"), by and between Medical Imaging Corp, an Nevada based Corporation ("Company"); and Partners Imaging Holdings LLC a Florida Limited Liability Company ("Provider"); (each of Companies and Provider may be referred to as a "party").

### Background:

This Agreement will be effective following the successful closing of the Purchase Agreement (the "Purchase Agreement") dated August 28, 2014 between Medical Imaging Corp. (as "Buyer"), and Partners Imaging Holdings LLC (as "Seller"), under which Seller sold the interests in each Company to Buyer on October 31st, 2014

The Company desires to engage Provider to provide billing and collection services for patients of Company in accordance with this Agreement.

Now Therefore, the parties hereto agree as follows:

1. **Engagement of Provider.** Company hereby engages Provider as the exclusive provider of the Professional Services herein described

2. **Provider obligations.** Provider will accept billing packets from Partners Imaging Center of Venice, LLC, Partners Imaging Center of Naples, LLC and from Partners Imaging Center of Charlotte, LLC on behalf of Company and upload the billing information generated by Company into the Providers RIS system. Provider will then invoice both public and private payors accordingly. Provider will document all transactions for each center. Payor will collect revenues generated by Company and make a weekly payment by wire transfer of any revenues collected to a bank of Providers choosing. Provider will provide a summary and deduct fees from the amount wired to Company. Provider will take all steps to collect monies due from payors in the shortest possible time frame and will work AR on a continuous basis. Payor will collect revenue from direct bank payments, credit card and checks. Provider will provide summary of any AR not collected at the end of the agreement.

3. **Company obligations.** Company will provide Provider with billing packets in an acceptable format to Provider. Packets are to be mailed or delivered to Provider for the attention of the Billing Manager. Company to ensure packets are photocopied in case of loss in transit. Company will comply with any requests from Provider for additional, missing or errors in need of correction and any other information that prevents the billing information from being entered into Provider RIS system. Company will provide information relating to cash collected from a patient so that Provider can deduct these monies from patient totals in Providers RIS system. Company agrees to cover the costs of bank wire transfers and for the fees of the services provided.

Exhibit 1

4.   **Availability.**  Provider shall perform billing and collection services on Monday to Friday between the hours of 8.00am and 5.00pm of each week, except as otherwise mutually agreed by the parties.

5.   **Consideration.**  Company shall pay Provider for the professional services performed relating to billing and collection at the rate of (five) 5% of revenues collected on behalf of Company.  The consideration will be deducted from the monies due to Company whenever a wire is performed. Provider will email a summary of monies collected and consideration deducted including wire fees.

6.   **Term.**  The term will be for a period of one month starting November 1st, 2014.  Company has the option to extend services one more month by providing email notice.  As of January 1st, 2015, Provider will no longer accept billing packets from Company but will continue to collect any existing AR on behalf of Company.  The agreement will terminate on June 1st, 2015.

7.   **Confidential Information.**  Provider agrees to keep in strict secrecy and confidence, both during and after the Term, any and all information relating, directly or indirectly, to Company, its business, or its Patients.

In **Witness Whereof**, the parties hereto executed this Agreement as of the date first above written.

Provider:

**Partners Imaging Holdings LLC**
A Florida Limited Liability Company

By: _____
       Richard Goldberg, M.D., Managing Member

Company:

**Medical Imaging Corp, LLC**
A Nevada company
As Sole Managing Member

By: _____
       Mitchell Geisler, CEO

Exhibit 1

**EXHIBIT 2**

Exhibit 1

## Global Amendment Agreement

This Agreement (this "Agreement") is entered into on March 11, 2015 (the "Effective Date"), by and between Medical Imaging Corp, an Nevada based Corporation ("Company"); Partners Imaging Center of Venice, LLC (a "Center"), Partners Imaging Center of Charlotte, LLC (a "Center"), Partners Imaging Center of Naples, LLC (a "Center"), and Partners Imaging Holdings LLC a Florida Limited Liability Company ("Provider"); (each of Company, Centers and Provider may be referred to as a "party"). This Agreement supplements and amends the Professional Services Agreement dated October 31, 2014, effective November 1, 2014, as amended between Company and Provider (the "Billing Agreement"), and the the three "reading" agreements dated October 31, 2014, effective November 1, 2014, among the Provider and each Center (the "Reading Agreements").

WHEREAS, the Parties hereto seek to amend certain terms of the Billing Agreement and the Reading Agreements by this further Agreement, and to resolve certain differences that have arisen between the parties.

NOW, THEREFORE, in consideration of the foregoing and the mutual obligations set forth herein, the parties hereby agree as follows:

1.      Each of the Reading Agreements is hereby amended to change the term of each that is set forth in Section 4(a) to now provide that the Reading Agreements will terminate on May 31, 2015. Notwithstanding the foregoing termination date, Provider agrees that the Reading Agreements will be extended until August 31, 2015, for Professional Services that will be billed to no more than either (i) three non-individual Private Payors, or (ii) two non-individual Private Payors and Medicaid (a Government Payor), as Company may elect in writing to Provider, if the Company/Center(s) has not yet been fully credentialed by those payors to submit claims for payment of the Professional Services provided under the Reading Agreements. For clarity, the number of Payors referred to is three in the aggregate for all the Centers, and not three for each Center. Further, as to each Payor that the Provider is providing Professional Services under the Reading Agreements that are fully credentialed by the Company/Center(s) after May 31, 2015 and before August 31, 2015, then the Provider will cease providing services under the Reading Agreements as to that Payor as of a date that is five business days after the full credentialing of the Company/Center as to that Payor is complete and receipt of notice from the Company/Center to Provider; the Company/Center shall give prompt notice, but in no event more than five business days, after such Payor's notice to the Company/Center of the full credentialing by the Payor. Upon any full credentialing of the Company/Center by a Payor and the Company's/Center's election to transfer the Professional Services of the Reading Agreement to its employees or other providers, then the exclusivity provisions of Section 2(b) "Exclusive Provider" and Section 2(c) "Billings" and the other similar obligations of the "Company Obligations" of the respective Reading Agreements requiring the Company/Center to use only the Professional Services of Provider shall not longer apply. For clarity, where in this

1

Exhibit 1

Agreement the term "non-individual Private Payors" is used as defined in the Reading Agreement but eliminates individuals.

2.     The provisions of the Reading Agreements for a renewal term in Section 4(b) are deleted.

3.     Because the Provider currently is processing claims in respect of the services for which there is a substantial amount of claims being processed and it is anticipated that there will be continuing claims to be processed by Provider, but only for Professional Services of Provider, and Provider will have a security interest in the accounts receivable being processed by and being paid to Provider but for the benefit of the Company, Provider will not exercise the right to terminate the Reading Agreements set forth Section 4(d)(i), unless the amounts owed by the Company/Centers under the Reading Agreements for the Professional Services exceed the amount of the accounts receivable being processed by the Provider.

4.     The term of the Billing Agreement for the processing of new billing reimbursement claims for Professional Services under the Reading Agreements only is hereby modified to be until May 31, 2015; provided that notwithstanding the foregoing termination date, Provider agrees that the Billing Agreement will be extended until August 31, 2015, for new claims to be billed in respect of Professional Services provided by Provider under the Reading Agreements that will be billed to no more than three Payors as provided in paragraph 1 above. For clarity, the number of Payors referred to is three in the aggregate for all the Centers, and not three for each Center. New billing services by Provider will cease within 5 business days after receipt of notice from the Company/Center that the last Payor has been credentialed as provided in paragraph 1 above. Additionally, to provide a tail period for the processing of claims that have been submitted by the Provider, the Billing Agreement will terminate on November 30, 2015. In addition to any other terms of this Agreement, if Provider has not been paid in full for all services under the Reading Agreements and the Billing Agreement, Provider may elect to continue to process its collections so that it continues to receive payments from payors until it has been paid in full.

5.     During the term of the Billing Agreement and thereafter, the Company will have the right to contact any Government Payor and non-individual Private Payor to which a billing reimbursement claim has been submitted on behalf of or for the Company to help resolve any outstanding claims.  Although Provider is primarily responsible for pursing billing reimbursement claims that it has submitted under the Billing Agreement, where the Company is helping to collect those claims, Provider will cooperate with the Company to facilitate and effectuate the continued claim processing or resolution thereof. Provider will provide a final report as to each Government Payor and Private Payor to describe and identify any outstanding claims of a payor at the termination of the Billing Agreement.  If it is possible and if the Company takes over the prosecution of a claim along with the collection under Section 4, then Provider will not be paid any fees in respect of Section 5 of the Billing Agreement for the particular claim being prosecuted and for which a payment may be made by a payor to Company. At the request of the

Exhibit 1

Company and at Company's sole cost. Provider shall institute any legal proceeding to collect any outstanding billing reimbursement claim submitted by Provider but unpaid at the termination of the Billing Agreement.

6.      Provider agrees that it will pay to the Company all sums due to the Company under the Billing Agreement, subject to deduction or set-off as provided herein, within five business days of receipt by Provider, provided that the payments to be made on a Monday (or next business day if the Monday is a holiday) will be paid without fail by the end of the day on the Monday due date (or next business day if the Monday is a holiday).

7.      Subject to the provisions of this Section of the Agreement, Provider may deduct from any payments due to the Company/Centers the amounts due to the Provider for the Professional Services rendered under the Reading Agreements and the service fee under Section 5 of the Billing Agreement. Provider may not deduct any other amounts due to the Provider from the Company. Provider has retained on March 9, 2015, the sum of $38,417.72, on March 16, 2015 the sum of 19,082.28 and on March 23, 2015 the sum of $15,000.00 in payment of fees for Professional Services and service fees due and owing by the Company/Centers, and thereafter on each Monday (or next business day if the Monday is a holiday) the Provider will be entitled to deduct from amounts to be paid the sum of $15,000.00. At such time as the foregoing sum of $15,000 would represent an overpayment to Provider, or, after all prior amounts due Provider by Company/Centers have been paid, then the Provider and the Company, through their designated contact persons specified herein, will determine a revised amount to be deducted from each payment that is reflective of the payments to be due by the Company/Centers to the Provider for Professional Services and the processing fee. The sum shall be similarly adjusted in the event the revised amount causes an underpayment. Each Company/Centers and Provider contact person will have the right to initiate the discussion and a resolution of the amount to be deducted at any time, during regular business hours, and the Company/Centers and Provider contact persons will be promptly responsive, time being of the essence, and cooperative in determining such new amount to be deducted. The amounts deducted by Provider will be applied to the oldest amounts due by the Company/Centers to Provider for the Professional Services first and then the processing fee due under Section 5 of the Billing Agreement.

8.      Section 2 of the Billing Agreement is amended to include among the obligations of the Provider (i) to diligently pursue processing for payment from the Government Payors and Private Payors the billing packets from the Centers, and in any event, to use best efforts to submit claims within than five business days after the billing packets are submitted to Provider in the required form and with full, correct information, (ii) notify the Company contact person as soon as practicable about any problems in the billing packets from the Centers and any other problems encountered by the Provider in processing the reimbursement claims to be able to submit them to the Government Payors and Private Payors, and (iii) to use commercially reasonable best efforts to provide to the Company the reports indicated on the attached Schedule A hereto, in the time periods and scope as described on the Schedule A.

3

Exhibit 1

9.      Omitted.

10.     The Company/Center(s) agrees that it will diligently pursue obtaining all necessary ACHA licenses to permit the Company/Centers, through its Centers, to perform those professional services referred to in each of the Reading Agreements and processing of billing for professional services rendered by the Centers. Company/Centers shall advise Provider within 5 business days after each license is received.

11.     The Provider shall, and Provider shall cause each of the Principals and other required reading/billing personnel to, cooperate fully with the Company in its efforts to obtain all necessary ACHA licenses required by the Company/Centers to own and operate the Centers, time being of the essence. The Provider shall, and Provider shall cause the Principals and others, to, cooperate in the general area of the Sarasota office of the Provider, it being understood that they will have to travel away from the office to perform such requirements. The Provider shall, and Provider shall cause the Principals to, take their requested action within five business days of being requested to act, time being of the essence, absent some emergency. The Company shall, to the reasonable extent it is able, complete any required forms and indicate what has to be done to the Provider and the Principals, in writing, which may include an email. The Company will bear all direct expenses, including without limitation filing fees, service fees and fingerprinting, of the actions requested by the Company of the Provider and the Principals, but it is understood that there will be no time charge or mileage and similar reimbursement.

12.     The Company/Center(s) agrees that it will diligently locate and credential with all authorities and with any government and private payors the personnel that are capable of performing the professional services referred to in each of the Reading Agreements, so that they may as soon as possible, in accordance with law and regulation, commence providing services to the Centers in substitution of the Provider.

13.     Dr. Rozin, a Principal, within 48 hours of the signing of this Agreement will communicate via email to Dr. Daniel Barr that the Provider is continuing to provide Services under the Reading Agreement with the Centers.  No additional comments or statements shall be told to Dr. Barr.

14.     The Provider, Principals and the employees, representatives and agents of the Provider on the one hand, and the Company and its employees and the staff of the Centers and their respective representatives and agents  on the other hand, will make not statements that are false in respect of any of the others or otherwise disparage in any writing, picture or oral communication or other manner, including without limitation any social media format, any of those persons, services, lawful or agreed upon actions of any of the others, at any time after the date of this Agreement, such obligation to continue for 24 months following termination of the Billing Agreement.  Additionally, Provider, Principals and the employees, representatives and agents of the Provider will not discuss the terms of this Agreement, the Billing Agreement and the Reading Agreements with any persons other than their advisors and their employees, representatives and agents,

4

Exhibit 1

including indicating to any other parties the termination date of the Reading Agreements and Billing Agreement, without the express written permission of the Company, which confidentiality shall end 24 months after termination of the Billing Agreement. The foregoing shall not preclude anyone from responding to false or disparaging information or statements made about them by another party or its employees, representatives, or agents, or statements made as required by law.

15.    The Company/Centers contact person will initially be Mitch Giesler, provided that for billing matters then the person will initially be Hagit Berkovich. The Provider contact person will initially be Nigel de Wit. The contact persons may be changed from time to time, upon notice to the other party.

16.    The Provider will make its officers designated from time to time by Provider reasonably available from time to time to Company personnel to consult on general mutual business, referring physicians, workflow, transfer to the Company systems, among other things, intended to provide for the carrying out of this Agreement and the Billing Agreement and the Reading Agreements. The Provider will cause its Principals to be reasonably available from time to time to Company personnel to discuss clinical medical matters only provided such time shall not exceed 2 hours per week except in case of emergency.

17.    RELEASE OF CLAIMS PROVISION

Each of Medical Imaging Corp. ("MIC"), Partners Imaging of Venice, LLC, Partners Imaging of Charlotte, LLC, and Partners Imaging of Naples, LLC, and for the legal representatives, successors and assigns thereof (each a "Releasor"), does hereby release, remise, acquit, satisfy and forever discharge each of Partners Imaging Center of Sarasota, LLC, Partners Imaging Holdings, LLC ("PIH"), Richard M. Goldberg, and Roman Rozin, and the heirs, legal representatives, successors and assigns thereof, and the employees, officers, directors, managers, members, owners and principals and agents thereof (each a "Releasee"), of and from each and every claim, demand, controversy, action, suit, proceeding, bill, specialty, reckoning, variance, trespass, damage, judgment, execution, bond, right, covenant, promise, contract, agreement, understanding, debt, account, duty, obligation and liability (including a right based on indemnity, contribution or a third party), in law or in equity, at common law, statutory or otherwise, known or unknown, now existing or hereafter arising due to an occurrence prior to the date hereof, relating to (i) any claim, under the Purchase Agreement ("Purchase Agreement") dated August 28, 2014 between certain Releasors and certain Releasees or its related documents, that a Releasee did not disclose one or more license requirements or an exemption from any license requirement for any Company described in the Purchase Agreement, and (ii) a claim, under the Professional Services Agreement dated November 1, 2014, as amended on January 2, 2015, between MIC and PIH providing for billing and collection services, that the services due prior to the date hereof were not timely under the terms of the agreement. The release set forth in subpart "(i)" above will only become operative on the earlier of the date that (a) MIC obtains its license approval from the Florida AHCA, or (b) the completion of the obligations of PIH under the Billing

5

Exhibit 1

Agreement. The release in (i) shall be inoperative if the Billing Agreement is terminated early by Provider in breach of the Billing Agreement. This shall not release any rights or duties arising under this instrument or the Reading Agreements and Billing Agreements as they continue after the date hereof. Each Releasor warrants and represents that such Releasor has not heretofore assigned or otherwise transferred any interest in or to any item which is the subject matter intended to be released hereunder.

18.     The Security Agreement attached shall be executed and delivered by the parties thereto simultaneously herewith.

*[Remainder of page intentionally left blank; signature page to follow]*

6

Exhibit 1

IN WITNESS WHEREOF, the parties hereto executed this Agreement as of the date first written above.

Provider:

Partners Imaging Holdings LLC

By: _____

Richard Goldberg, M.D., Managing Member

Company for itself and each of the Centers:

Medical Imaging Corp, LLC

Partners Imaging Center of Venice, LLC

Partners Imaging Center of Charlotte, LLC

Partners Imaging Center of Naples, LLC

By: _____

Mitchell Geisler, Authorized Signatory

7

Exhibit 1

## Schedule A

1) Summary AR report                          Weekly / Monthly (1)

2) Patient payment/receipts report            Weekly
   Example: Patients payments received March16-20, 2015 to be provided by March 30, 2015.

3) Patient payment/receipts report            Monthly (2)
   Example: March 2015 patients' payments report to be provided by April 14, 2015.(same but will only apply for complete weeks)

4) Insurance payments/receipts report         Weekly (3)
   Example: payments received March16-20, 2015 to be provided by March 30, 2015.

5) Insurance payments/receipts report         Monthly (4)
   Example: March 2015 patients' payments report to be provided by April 14, 2015.(same as above except monthly)

6) Adjustments report                         Monthly (5)

7) Charges report                             Weekly (6)
   Example: Charges for Mar 9-13, 2015 to be provided by Mar 30, 2015

8) Charges report                             Monthly (7)
   Example: Charges for March, 2015 to be provided by April 14, 2015

### Notes:

1 Report to disclose ending period for which charges, payments, and adjustments have been recorded
2 Same type of report provided weekly, but will only apply to complete weeks
3 Report to include claims detailed (Patient & Date of service) and categorized by payors.
4 Same type of report provided weekly, except monthly
5 Not to be used for calculating receipts
6 Report to be filtered by modality
7 Same type of report provided weekly. except monthly and filtered by modality as well

8

Exhibit 1

# EXHIBIT 3

Exhibit 1

## Modification Agreement
(to Global Amendment Agreement)

This Modification Agreement is made on June 1, 2015, by and between

Medical Imaging Corp, a Nevada based Corporation ("Company"); Partners Imaging Center of Venice, LLC (a "Center"), Partners Imaging Center of Charlotte, LLC (a "Center"), Partners Imaging Center of Naples, LLC (a "Center") (each Company and each Center may be referred to as a "party"), and

Partners Imaging Holdings LLC a Florida Limited Liability Company ("Provider" and a "party").

### Background

The parties entered into the Global Amendment Agreement dated March 11, 2015 (the "Agreement"), including the Security Agreement identified therein.

The parties desire to modify the Agreement as set forth herein.

For value received and acknowledged, and intending to be legally bound, the parties agree as follows:

1.      Modification(s).  The Agreement is modified as follows:

A.      The Reading Agreement term ending May 31 in paragraph 1 of the Agreement and the Billing Agreement term ending May 31 in paragraph 4 of the Agreement is extended for each Center through the earlier of (i) 10 days after receipt by the Center of its AHCA license [Company or the Center receiving the AHCA license shall notify Provider within 48 hours of such Center's receipt of its AHCA license], or (ii) June 30, 2015. By written notice delivered to Provider by June 30, 2015, Company and each Center shall be entitled to extend the date for any Center not having an AHCA license for a further 30 days subject to the same termination terms as the preceding sentence.

B.      The Reading Agreement period of May 31 through August 31 (relating to ceasing services for credentialed Payors) and the term ending August 31 both in paragraph 1 of the Agreement and the Billing Agreement terms ending August 31 and November 30 in paragraph 4 of the Agreement, will be extended for each Center whose term was extended in 1 above for the same number of days contained in the extended time period(s) as set forth in 1 above.

C.      The 5% rate in paragraph 5 of the Billing Agreement is increased to 6.5% beginning June 8, 2015. The rate is increased again to 8% beginning July 1, 2015.

D.      The following 2 sentences from paragraph 17 of the Agreement will be deleted and substituted with the language contained in Section 1(E) of this Modification.

Exhibit 1

"The release set forth in subpart "(i)" above will only become operative on the earlier of the date that (a) MIC obtains its license approval from the Florida AHCA, or (b) the completion of the obligations of PIH under the Billing Agreement. The release in (i) shall be inoperative if the Billing Agreement is terminated early by Provider in breach of the Billing Agreement."

E.     The following 2 sentences shall be substituted for the language deleted as set forth in Section 1(D) of this Modification:

"The release in subpart (i) above will only become operative as to a particular Center on the earlier of (a) receipt by the Center of its AHCA license, or (b) July 31, 2015. The release in (i) shall be inoperative as to a particular Center if the Billing Agreement is terminated as to the particular Center early by Provider in breach by Provider of the Billing Agreement prior to the earlier of (a) receipt by the Center of its AHCA license, or (b) July 31, 2015."

F.     The Release in subpart (ii) of paragraph 17 of the Agreement releases all claims to date of this Modification Agreement.

2.     **Term Meaning Continuity.** Terms defined in the Agreement shall have the same meaning herein except as provided otherwise herein.

3.     **Inconsistencies.** Notwithstanding any contrary provision herein or in the Agreement, the terms and conditions herein shall control any inconsistent provision in the Agreement.

4.     **Amended and Restated.** The Agreement is amended and restated as modified herein.

5.     **Counterparts; Facsimile or Electronic Signatures.** This Agreement may be signed in two or more counterparts all of which taken together shall constitute a single Agreement. A facsimile or other electronic signature shall be deemed an original for all purposes hereof.

2

Exhibit 1

[Signature page to Modification Agreement]

In Witness Whereof, the parties executed and delivered this instrument as of the date first above written.

Witnesses:

**Company/Centers:**
**Medical Imaging Corp.**
**Partners Imaging Center of Venice, LLC**
**Partners Imaging Center of Charlotte, LLC**
**Partners Imaging Center of Naples, LLC**

By _____

Mitchell Geisler
CEO of Company and
Authorized Signatory of Centers

_____ (Print Name)

_____ (Print Name)

**Provider:**
**Partners Imaging Holdings LLC**

By _____

Richard Goldberg, M.D.
Managing Member

_____ (Print Name)

_____ (Print Name)

3

Exhibit 1

[Signature page to Modification Agreement]

In Witness Whereof, the parties executed and delivered this instrument as of the date first above written.

Witnesses:

Company/Centers:
Medical Imaging Corp.
Partners Imaging Center of Venice, LLC
Partners Imaging Center of Charlotte, LLC
Partners Imaging Center of Naples, LLC

_____
_____(Print Name)

By_____
   Mitchell Geisler
   CEO of Company and
   Authorized Signatory of Centers

_____
_____(Print Name)

Provider:
Partners Imaging Holdings LLC

_____
_____ _____(Print Name)

By_____
   Richard Goldberg, M.D.
   Managing Member

_____
Jennifer Munoz (Print Name)

3

Exhibit 1

**EXHIBIT 4**

Exhibit 1

### Modification Agreement
(to Global Amendment Agreement)

This Modification Agreement is made on August __, 2015, by and between

Medical Imaging Corp, a Nevada based Corporation ("Company"); Partners Imaging Center of Venice, LLC (a "Center"), Partners Imaging Center of Charlotte, LLC (a "Center"), Partners Imaging Center of Naples, LLC (a "Center") (each Company and each Center may be referred to as a "party"), and

Partners Imaging Holdings LLC a Florida Limited Liability Company ("Provider" and a "party").

### Background

The parties entered into the Global Amendment Agreement dated March 11, 2015, which was thereafter modified by a further Modification Agreement dated June 1, 2015 (collectively, the "Agreement"), including the Security Agreement identified therein.

The parties desire to modify the Agreement as set forth herein.

For value received and acknowledged, and intending to be legally bound, the parties agree as follows:

1.      Modification(s).  The Agreement is modified as follows:

A.      The Reading Agreement term ending May 31 in paragraph 1 of the Agreement and the Billing Agreement term ending May 31 in paragraph 4 of the Agreement is extended for each Center through the earlier of (i) 10 days after receipt by the Center of its AHCA license [Company or the Center receiving the AHCA license shall notify Provider within 48 hours of such Center's receipt of its AHCA license], or (ii) August 31, 2015. By written notice delivered to counsel for the Provider by August 31, 2015, Company and each Center shall be entitled to extend the date for any Center not having an AHCA license for a further 30 days subject to the same termination terms as the preceding sentence.

B.      The Reading Agreement term ending August 31 in paragraph 1 of the Agreement and the Billing Agreement terms ending August 31 and November 30 in paragraph 4 of the Agreement, will be extended for each Center whose term was extended in 1 above for the same number of days contained in the extended time period(s) as set forth in 1(A) above in combination with the additional periods of time contained in the Modification Agreement executed in June 2015.

C.      The 5% rate in paragraph 5 of the Billing Agreement is increased to 6.5% beginning June 8, 2015. The rate is increased again to 8% beginning July 1, 2015.

D.      The following 2 sentences from paragraph 17 of the Agreement will be deleted and substituted with the language contained in Section 1(E) of this Modification.

Exhibit 1

"The release set forth in subpart "(i)" above will only become operative on the earlier of the date that (a) MIC obtains its license approval from the Florida AHCA, or (b) the completion of the obligations of PIH under the Billing Agreement. The release in (i) shall be inoperative if the Billing Agreement is terminated early by Provider in breach of the Billing Agreement."

E.     The following 2 sentences shall be substituted for the language deleted as set forth in Section 1(D) of this Modification:

"The release in subpart (i) above will only become operative as to a particular Center on the earlier of (a) receipt by the Center of its AHCA license, or (b) July 31, 2015. The release in (i) shall be inoperative as to a particular Center if the Billing Agreement is terminated as to the particular Center early by Provider in breach by Provider of the Billing Agreement prior to the earlier of (a) receipt by the Center of its AHCA license, or (b) July 31, 2015."

F.     The Release in subpart (ii) of paragraph 17 of the Agreement releases all claims to date of this Modification Agreement. To the extent the Company or a Center gives notice that it exercises the extension set forth in paragraph A, then the Release in subpart (ii) releases all claims to the later of August 31, 2015 or the date of the notice.

2.     The Company will endeavor to make a payment toward the Data Lines arrearage on or before August 31, 2015, but in no event later than September 30, 2015. To the extent that on September 30, 2015 there is still a balance on the Data Lines arrearage due and owing by the Company to the Provider (the "Arrearage"), the Provider may include repayment of the Arrearage as part of the $15,000 deducted each Monday from amounts due to the Company/Centers pursuant to Section 7 of the Global Amendment Agreement, dated March 11, 2015, until such time as the Arrearage is repaid in full. By way of example, if on a particular Monday the Provider is only owed $12,000 by the Company, it may still deduct the full $15,000 and apply the $3,000 toward the Arrearage.

3.     **Term Meaning Continuity.**  Terms defined in the Agreement shall have the same meaning herein except as provided otherwise herein.

4.     **Inconsistencies.**  Notwithstanding any contrary provision herein or in the Agreement, the terms and conditions herein shall control any inconsistent provision in the Agreement.

5.     **Amended and Restated.**  The Agreement is amended and restated as modified herein.

6.     **Counterparts; Facsimile or Electronic Signatures.**  This Agreement may be signed in two or more counterparts all of which taken together shall constitute a single Agreement. A facsimile or other electronic signature shall be deemed an original for all purposes hereof.

2

Exhibit 1

[Signature page to Modification Agreement]

In Witness Whereof, the parties executed and delivered this instrument as of the date first above written.

Witnesses:

**Company/Centers:**
**Medical Imaging Corp.**
**Partners Imaging Center of Venice, LLC**
**Partners Imaging Center of Charlotte, LLC**
**Partners Imaging Center of Naples, LLC**

H̶A̶G̶I̶T̶ ̶B̶E̶L̶K̶O̶V̶I̶C̶H̶ (Print Name)

By _____

Mitchell Geisler
CEO of Company and
Authorized Signatory of Centers

ENNCI
GOUGETA (Print Name)

**Provider:**
**Partners Imaging Holdings LLC**

_____ (Print Name)

By _____

Richard Goldberg, M.D.
Managing Member

_____ (Print Name)

3

Exhibit 1

[Signature page to Modification Agreement]

In Witness Whereof, the parties executed and delivered this instrument as of the date first above written.

Witnesses:

Company/Centers:
Medical Imaging Corp.
Partners Imaging Center of Venice, LLC
Partners Imaging Center of Charlotte, LLC
Partners Imaging Center of Naples, LLC

_____
_____ (Print Name)

By _____
      Mitchell Geisler
      CEO of Company and
      Authorized Signatory of Centers

_____
_____ (Print Name)

Provider:
Partners Imaging Holdings LLC

By _____
      Richard Goldberg, M.D.
      Managing Member

_____ NIGEL DE WIT . (Print Name)

_____ DAYANI Rochelle (Print Name)

3

Exhibit 1

JS 44 (Rev 11/15)

# CIVIL COVER SHEET

FILED

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
MEDICAL IMAGING CORP., PARTNERS IMAGING CENTER OF VENICE, LLC, PARTNERS IMAGING CENTER OF CHARLOTTE, LLC, and PARTNERS IMAGING CENTER OF NAPLES, LLC.

(b) County of Residence of First Listed Plaintiff   Clark County, NV
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Seth P. Robert, Brown Robert, LLP
150 N. Federal Highway, Suite 200, Fort Lauderdale, FL 33301
(954) 832-9400

## DEFENDANTS
PARTNERS IMAGING HOLDINGS LLC

County of Residence of First Listed Defendant   Sarasota
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
28 U.S.C. Section 1332
Brief description of cause:
Accounting and Breach of Contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ Not less than $1,158,323.00   CHECK YES only if demanded in complaint
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*   JUDGE _____   DOCKET NUMBER _____

DATE 08/14/2017   SIGNATURE OF ATTORNEY OF RECORD   SETH P. ROBERT   145696

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

Exhibit 1